IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| DAVID KIFER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 16-0017-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING FOR FURTHER CONSIDERATION**

Plaintiff David Kifer seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's mental impairment does not meet Listing 12.04, (2) finding plaintiff's subjective complaints of disabling symptoms not credible, (3) failing to give sufficient weight to the opinion of plaintiff's treatment psychiatrist, Dr. John Francis, and (4) giving too much weight to the opinion of consultative psychologist Susan Barngrover. I find that because all of the treatment records of plaintiff's treating psychiatrist, John Francis, D.O., are completely illegible, there is no way to determine what weight should have been given to his opinion regarding plaintiff's mental limitations.

*I.* **BACKGROUND**

On November 27, 2012, plaintiff applied for disability benefits alleging that he had been disabled since March 8, 2012. Plaintiff's disability stems from depression; anxiety; and elbow, shoulder, wrist and knee pain. Plaintiff's application was denied on

February 28, 2013. On July 9, 2014, a hearing was held before an Administrative Law Judge. On August 19, 2014, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 10, 2015, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### *III.*    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Kristine Skahan, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1980 through 2013, shown in both actual and indexed figures:

4

| Year | Actual Earnings | Indexed Earnings |
| --- | --- | --- |
| 1980 | $ 4,448.94 | $ 14,816.40 |
| 1981 | 3,918.58 | 11,856.61 |
| 1982 | 6,112.75 | 17,530.50 |
| 1983 | 5,781.28 | 15,809.72 |
| 1984 | 7,138.71 | 18,437.94 |
| 1985 | 12,487.46 | 30,934.76 |
| 1986 | 14,685.21 | 35,330.52 |
| 1987 | 14,191.50 | 32,095.83 |
| 1988 | 16,257.28 | 35,041.98 |
| 1989 | 16,569.43 | 34,354.58 |
| 1990 | 17,258.71 | 34,203.79 |
| 1991 | 18,036.85 | 34,461.69 |
| 1992 | 19,926.07 | 36,205.82 |
| 1993 | 18,159.60 | 32,714.77 |
| 1994 | 25,011.97 | 43,881.67 |
| 1995 | 20,624.30 | 34,789.34 |
| 1996 | 22,399.96 | 36,022.83 |
| 1997 | 29,618.54 | 45,005.40 |
| 1998 | 31,283.75 | 45,171.47 |
| 1999 | 28,813.83 | 39,408.89 |
| 2000 | 36,811.88 | 47,709.55 |
| 2001 | 39,903.60 | 50,511.51 |
| 2002 | 53,754.85 | 67,369.31 |
| 2003 | 55,726.98 | 68,174.38 |
| 2004 | 38,202.55 | 44,659.50 |
| 2005 | 56,053.92 | 63,215.04 |
| 2006 | 57,321.75 | 61,804.10 |
| 2007 | 59,059.66 | 60,913.57 |
| 2008 | 84,641.36 | 85,335.24 |
| 2009 | 56,006.69 | 57,330.41 |
| 2010 | 38,667.39 | 38,667.39 |
| 2011 | 57,840.80 | 57,840.80 |
| 2012 | 35,402.54 | 35,402.54 |
| 2013 | 0.00 | 0.00 |

Case 4:16-cv-00017-REL   Document 17   Filed 12/02/16   Page 5 of 19

(Tr. at 115-116).

**Function Report Third Party**

Plaintiff's wife completed this form on January 14, 2013 (Tr. at 169-176). She reported that plaintiff goes grocery shopping or gift shopping with her once a week for one hour. His impairments affect his ability to understand, follow directions, complete tasks, get along with others, concentrate and remember. His impairments do not affect any physical ability including his ability to use his hands. He can follow instructions with reminders. His ability to pay attention depends on the task.

*B.     SUMMARY OF TESTIMONY*

During the July 9, 2014, hearing, plaintiff testified; and Kristine Skahan, a vocational expert, testified at the request of the ALJ.

**1.     Plaintiff's testimony.**

At the time of the hearing plaintiff was 52 years of age (Tr. at 32). He has a high school education (Tr. at 32). Plaintiff last worked on March 6, 2012, doing auto assembly (Tr. at 32-33). He worked for General Motors for 13 years, and prior to that he worked at TRW as a piston ring manufacturer (Tr. at 33).

Plaintiff stopped working at General Motors due to lots of confrontations with supervisors (Tr. at 33). He originally worked at the plant in Wentzville, Missouri, but worked at the Fairfax facility from February 2008 to March 2012 (Tr. at 35). While he was at the Fairfax facility, he was suspended for confrontations with other coworkers or supervisors five or six times (Tr. at 36). At that time he was seeing a Dr. Francis and was taking medication for major depressive disorder, ADD, and bipolar disorder (Tr. at

36). He was first diagnosed with that in 2005 or 2006 (Tr. at 36). Plaintiff was sent to EAP and those people decided plaintiff needed to go have therapy and see psychiatrists and doctors and he would not be allowed to come back to work until he cleared medical (Tr. at 33-34). Although plaintiff's records show earnings in 2013, he was not working, he was being paid long term disability[1] (Tr. at 34).

Plaintiff is compliant with his medications (Tr. at 37). He sees Dr. Francis about once a month (Tr. at 37). When plaintiff was working, it felt like everyone was hovering over him and he was expected to do more than everyone else, never mess up (Tr. at 37-38). If he did mess up, he was not told right away so he could fix it, rather they would let it go for a while until it became a major problem (Tr. at 38). If other employees were doing something wrong, they would put someone with those employees and work with them until they got the job down pat, but plaintiff felt he did not get the same treatment (Tr. at 38).

On his last day of work, he asked to use the restroom and his supervisor said it might be a few minutes because the team leaders were tied up (Tr. at 38). Plaintiff said that was OK, that it was not an emergency at the moment (Tr. at 39). After 20 minutes, he alerted his supervisor with the "end on cord" (Tr. at 39). The supervisor came running, telling plaintiff not to stop the line (Tr. at 39). Plaintiff released the cord and said he needed to use the restroom (Tr. at 39). The supervisor said he had no one to

---

[1]Plaintiff's attorney explained that when a person goes out on sick leave or disability at General Motors, he gets sick and accident pay for up to a year after that because he is transferred to disability (Tr. at 34). Social Security taxes are withheld from sick or accident pay (Tr. at 34).

7

Case 4:16-cv-00017-REL   Document 17   Filed 12/02/16   Page 7 of 19

cover for plaintiff, plaintiff said it was an emergency, he pulled the cord to stop the line, and he left to go to the restroom (Tr. at 39). When plaintiff came back to his job station, his supervisor told him he was on notice for stopping the line and leaving the job (Tr. at 39). Plaintiff said he did not know what else he could do, he had to go to the restroom (Tr. at 39). His supervisor said, "Well, that's why I chose the field I chose, I can go to the bathroom anytime I want." (Tr. at 39). That angered plaintiff who postured like he was going to start a physical altercation (Tr. at 39). Plaintiff was sent to employee relations and suspended indefinitely (Tr. at 39). Plaintiff was told he could not come back to work until he cleared medical, and he has never been cleared to return (Tr. at 40).

Plaintiff never talked to anyone at General Motors about his position (Tr. at 40). He only knew that he had until April 15, 2015, to apply for disability retirement (Tr. at 40).

Plaintiff was suspended eight to ten times for confrontations with coworkers and supervisors when he was at the Wentzville plant (Tr. at 40-41). Plaintiff did not feel he was treated the same as everyone else (Tr. at 41). Plaintiff does not really trust anyone (Tr. at 41).

Plaintiff typically stays home (Tr. at 34-35). Occasionally he goes to the hospital where his wife works to see her (Tr. at 35). He has not seen his parents or any other family members besides his son in 2 1/2 years (Tr. at 35). Plaintiff is able to drive (Tr. at 35). He does not socialize anywhere else other than visiting his wife at the hospital when she is working (Tr. at 41).

Plaintiff does not do any housework (Tr. at 41). His wife handles the bills (Tr. at 41). Plaintiff tried to handle the bills before, but he wound up filing for bankruptcy the year before the administrative hearing (Tr. at 41).

Plaintiff has feelings of extreme sadness every day (Tr. at 42). He is always worried, he does not sleep much, he wakes four to five times a night, and he is sleepy all day causing him to take four or five naps every day (Tr. at 42). Plaintiff used to have suicidal thoughts but that is better now that he is on medication (Tr. at 42). Plaintiff has odd dreams and panic attacks (Tr. at 43). Plaintiff has memory problems -- he cannot cook because he burns things because he forgets he has something on the stove (Tr. at 44). Plaintiff does not like being around people (Tr. at 44).

In the past, plaintiff had bilateral carpal tunnel surgery, shoulder reconstruction surgery, knee surgery, and two elbow surgeries (Tr. at 44-45). After every surgery, he went back to work (Tr. at 45). Plaintiff's grip is poor, he got into confrontations at work for dropping things and having to stop to pick them up (Tr. at 45).

Plaintiff would like to work for a few more years if he could (Tr. at 46-47). He does not believe there is any job he can do because of his medication and he cannot tolerate being around people (Tr. at 47).

**2.      Vocational expert testimony.**

Vocational expert Kristine Skahan testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes auto assembler (unskilled medium) and boring machine operator (semi-skilled medium) (Tr. at 47-58).

The first hypothetical involved a person who could perform the full range of medium work except that he could not power grasp or twist bilaterally. He would have no limit on ordinary manipulation. He should not work around vibrating tools or machinery (no power tools, drills, power screwdrivers, power wrenches, etc.) The person would be limited to repetitive work that does not involve complex instructions and it should not involve any detailed tasks. The person should not have any interaction with the general public and only superficial interaction with coworkers and supervisors (Tr. at 48).

Such a person could not perform plaintiff's past relevant work (Tr. at 48). The person could, however, work as a linen room attendant, DOT 222.387-030, SVP 2, unskilled, medium, with 1,300 jobs in Missouri and 45,000 in the country; laundry worker, DOT 361.684-014, SVP 2, unskilled, medium, with 1,500 jobs in Missouri and 120,000 in the country; or order filler, DOT 922.687-058, SVP 2, unskilled, medium, with 1,200 jobs in Missouri and 37,000 in the country (Tr. at 48).

If the person could not accept criticism from supervisors "at all," he could not work (Tr. at 49-50). If the person could not complete a normal workday without interruptions from psychologically based symptoms, he could not work (Tr. at 50).

**C.   SUMMARY OF MEDICAL RECORDS**

On May 5, 2011, Brad Storm, M.D., noted that plaintiff had "complete relief" of his cubital tunnel syndrome[2] after surgery several months earlier (Tr. at 213). He had

---

[2]Cubital Tunnel Syndrome is a condition that involves pressure or stretching of the ulnar nerve (also known as the "funny bone" nerve), which can cause numbness or tingling in the ring and small fingers, pain in the forearm, and/or weakness in the hand.

since had some tingling and numbness in his ring and small fingers. Dr. Storm ordered an EMG but said plaintiff could remain on full duty at work in the interim.

On May 13, 2011, plaintiff's EMG was normal (Tr. at 217).

On June 15, 2011, Brad Storm, M.D., performed a re-release of the cubital tunnel nerve (Tr. at 222-223).

On July 11, 2011, during a follow up for cubital tunnel syndrome, plaintiff indicated he had no complaints (Tr. at 225). He was released to return to work on full duty beginning July 18, 2011 (Tr. at 227). Because this was a work-related injury, plaintiff received a 10% impairment of the right upper extremity due to any limitations of strength and persisting symptoms of the ring and small finger numbness and tingling that would be permanent in nature (Tr. at 233).

On November 14, 2011, plaintiff saw Paula Davis, M.D., for an annual physical exam and complaining of neck pain (Tr. at 270-271). Plaintiff reported that recently his mood had been low, his interest had been low, and he had felt sad. On exam Dr. Davis observed that plaintiff was pleasant and in no acute distress. Plaintiff had tenderness and restricted range of motion in his neck. She assessed cervical radiculopathy and depression with anxiety. She ordered blood work and an MRI of the cervical spine, and discussed trial medications for depression and anxiety. She told him to follow up in a month for a prescription.

On November 21, 2011, plaintiff had an MRI of his spine due to complaints of neck pain (Tr. at 255). The results were normal.

March 8, 2012, is plaintiff's alleged onset date.

On December 26, 2012, plaintiff saw Paula Davis, M.D., for a cyst on his hand, bilateral joint pain, and "doesn't know doses on meds." (Tr. at 268-269). "Has been very depressed, missed a lot of work, now considering disability. Level of mood is still sad and feels like just hanging on for wife, son, and nine mo[nth] old dog. He would like to return to work." Dr. Davis observed that plaintiff was alert and neatly groomed but he looked very sad. "Does smile at times, does not have suicidal idea or plan." He was assessed with a cyst on his hand and inflammatory arthritis. She referred him to orthopedic surgery for the hand cyst and ordered x-rays.

On December 28, 2012, plaintiff had x-rays of his hands due to complaints of joint tenderness (Tr. at 257, 275-276). The x-rays showed early osteoarthritis.

On January 16, 2013, plaintiff saw Paula Davis, M.D., for a follow up on blood work (Tr. at 266-267). "David is feeling better emotionally." Dr. Davis observed that plaintiff was in no apparent distress and was "pleasant." His physical exam was normal. She assessed hyperlipidemia and depression with anxiety. She recommended that plaintiff "be as active as possible."

On February 22, 2013, Susan Barngrover, Ph.D., examined plaintiff in connection with his application for disability benefits (Tr. at 251-254). Plaintiff arrived early and said his son had "driven him up to the highway and that he got a ride home." Plaintiff was unshaven but otherwise kempt. His gait was normal, speech was somewhat slow. Plaintiff reported participating in counseling about every two weeks. He was sent to anger management by his employer when he lived in eastern Missouri.

Plaintiff had problems with recall after 30 minutes, and he said he has always had a problem with memory. "The claimant's short term memory seems to be impaired but his long term and remote memories appear to be good." Plaintiff reported some auditory hallucinations -- he said he hears his son's voice (the son who does not live with him) and gets up to see him and then realizes that he is not there. Plaintiff said he tends to avoid people as he has a temper and does not want to lose control. He is sad most of the time but does not cry. Plaintiff worries and has a panic attack a couple of times a week. He had a panic attack when he saw a bankruptcy lawyer. He said he is filing for bankruptcy because he cannot pay his ex-wife's mortgage. Plaintiff has broken sleep, but sleep medications give him nightmares so he does not take them. "The claimant can interact socially at least in my room and can adapt to his environment as he made arrangements to get here despite having to change the appointment due to the weather.[3] It appears that the claimant has the judgment to remove himself in a situation that might escalate his temper." Dr. Barngrover assessed Bipolar II, ADD unspecified, avoidant traits, and a GAF of 60. "It appears that the claimant would be able to function in a simple work like setting as long as he continued his treatment regimen especially in a non people oriented manufacturing setting where he has skills. It is recommended that the claimant continue to follow through with his treatment and would be a good candidate for Vocational Rehabilitation to help him return to the manufacturing setting or perhaps return to General Motors."

---

[3]The doctor changed his appointment the day before due to bad weather.

On February 25, 2013, Raphael Smith, Psy.D., completed a Mental Residual Functional Capacity Assessment (Tr. at 56-58, 60-62). He did not examine plaintiff but reviewed his medical records. Dr. Smith found that plaintiff is capable of working in a low skill environment with no public interaction and limited interactions with coworkers. Specifically he found that plaintiff was not significantly limited in many mental functions but was moderately limited in others.

On December 4, 2013, plaintiff saw Paula Davis, M.D., for a physical (Tr. at 263-264). Plaintiff complained of a cyst on his finger. "He continues to have stable but very depressed mood." He complained of some pain and swelling of the knees and shoulders, and back and neck stiffness. During a review of systems, plaintiff reported persistent major depression with anxiety, stable, and no suicidal or homicidal ideation. On exam Dr. Davis observed that plaintiff was alert and neatly groomed. He had a very flat affect. He had a "slight decrease" in range of motion in his neck with tender paraspinous muscles. Dr. Davis ordered lab work and referred plaintiff to Dr. Scott Langford, an orthopedic surgeon, regarding plaintiff's finger cyst.

On January 10, 2014, plaintiff saw Scott Langford, M.D., at the request of Dr. Davis for plaintiff's complaints of a right hand problem (Tr. at 258-261). Plaintiff stated that he was on long-term disability due to depression and anxiety. Plaintiff had a cyst on his right index finger and complained that his joints are sore in his hands. Dr. Langford observed that plaintiff's mood and affect were normal. X-rays of the right hand showed some mild arthritis changes; the wrist was normal. X-rays of the left hand were normal with some mild arthritis. The left wrist was normal. He was assessed with

14

a mucous cyst. Plaintiff said it was bothering him and he wanted it removed, so Dr. Langford scheduled plaintiff for surgery.

## V. FINDINGS OF THE ALJ

Administrative Law Judge George Bock entered his opinion on August 19, 2014 (Tr. at 14-25). Plaintiff's last insured date is December 31, 2017 (Tr. at 14).

Step one. Plaintiff engaged in substantial gainful activity after his alleged onset date -- from March 8, 2012, through March 31, 2013 (Tr. at 16). There was no evidence that plaintiff's work activity was subsidized by an employer or that any of his earnings were used for attendant care services, medical services, equipment prosthesis, similar items and services, medication or medical services that are necessary to control a disabling condition thereby enabling him to work (Tr. at 17).

The following steps deal with the period during which plaintiff did not engage in substantial gainful activity (Tr. at 17).

Step two. Plaintiff has the following severe impairments: anxiety-depression, memory disorder, bipolar disorder, and history of carpal tunnel syndrome and cubital tunnel syndrome (Tr. at 17). Plaintiff's history of knee surgery, history of rotator cuff tear and cyst on the finger are not severe impairments (Tr. at 17).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 17-19).

Step four. Plaintiff's testimony regarding disabling symptoms is not credible (Tr. at 20-21). The medical source statement mental completed by plaintiff's treating psychiatrist, John Francis, D.O., was given no weight

Case 4:16-cv-00017-REL   Document 17   Filed 12/02/16   Page 15 of 19

> . . . because it is not well supported by the clinical signs and findings in the objective evidence previously cited, claimant's history of treatment and the conclusions of Dr. Barngrover, a psychologist. Further, this is just a check box opinion that did not cite any specific examinations, diagnostic tests or objective medical findings that corroborate this opinion.

(Tr. at 23). Plaintiff retains the residual functional capacity to perform medium work except he can have no exposure to vibration, power grasping or twisting. He has no limitation on ordinary manipulation. He is limited to repetitive work with no complex instructions, no interaction with the general public and only occasional/superficial interaction with coworkers and supervisors (Tr. at 19). With this residual functional capacity, he is unable to return to any past relevant work (Tr. at 23).

Step five. Plaintiff is capable of performing other work available in significant numbers, such as linen room attendant, laundry worker, and order filler (Tr. at 24).

## VI. ANALYSIS

Plaintiff argues that the ALJ erred in (1) finding that plaintiff's mental impairment does not meet Listing 12.04, (2) finding plaintiff's subjective complaints of disabling symptoms not credible, (3) failing to give sufficient weight to the opinion of plaintiff's treating psychiatrist, Dr. John Francis, and (4) giving too much weight to the opinion of consultative psychologist Susan Barngrover. The record contains 189 pages of treatment records from Dr. Francis. None of them are legible.

Dr. Francis completed a mental residual functional capacity assessment in which he found (as the ALJ noted, by using circles or checkmarks) that plaintiff was either extremely limited or markedly limited in every single mental function on the form (21 different functions) (Tr. at 467-470). He found that plaintiff was markedly limited in his

16

ability to understand, remember and carry out very short and simple instructions. He found that plaintiff was markedly limited in his ability to travel in unfamiliar places or use public transportation, even though the record elsewhere reflects that plaintiff is able to drive by himself. He found that plaintiff would need to miss work 30 days per month because of his mental impairment or treatment. When asked to explain why he believed plaintiff would not be able to work on a regular and sustained basis, Dr. Francis wrote that plaintiff's depression is disabling.

While it appears that this mental residual functional capacity assessment is likely not worthy of any weight, especially since no other doctor observed any abnormal mental symptoms other than sadness, the fact that nearly all of plaintiff's treatment records are from this doctor and the reason he claims he is disabled and the ALJ erred is based on the opinion of this doctor, these illegible records cannot just be ignored.

The Eighth Circuit has held that illegibility of important evidentiary material can warrant a remand for clarification and supplementation. Bishop v. Sullivan, 900 F.2d 1259, 1262 (8th Cir. 1990), citing Miller v. Heckler, 756 F.2d 679, 680-681 (8th Cir. 1985); Brissette v. Heckler, 730 F.2d 548, 550 (8th Cir. 1984); Cutler v. Weinberger, 516 F.2d 1282, 1285 (2d Cir.1975) (illegible medical reports provide reviewing court with no way to determine whether the Secretary fully understood the medical evidence before him). Cf. Marshall v. Schweiker, 688 F.2d 55 (8th Cir. 1982) (although several pages of medical records are illegible, there was more than enough evidence to support the Secretary's decision and no indication that the illegible records would aid the claimant).

17

> It is the ALJ's duty to develop the record fully and fairly, even in cases in which the claimant is represented by counsel. Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985). Based on the record before us, we cannot determine whether Bishop's combined impairments following his back surgery meet or equal a listed impairment or whether he is otherwise disabled. We doubt that the ALJ could properly decipher all the medical reports any better than we could. On remand, the parties should determine which of the existing medical records are relevant and provide the ALJ with legible copies of these records or direct interrogatories to doctors and hospital personnel.

Bishop v. Sullivan, 900 F.2d at 1262.

In this case, the ALJ did not mention any of the treatment records of Dr. Francis, not even to say they are not legible. Neither party, not even plaintiff, was able to cite to Dr. Francis's records to support the doctor's opinion or to support the ALJ's opinion.

Because there are no legible treatment records for the one impairment that is decisive in this case, I have no choice but to remand this case for further consideration. If Dr. Francis is unable to provide legible copies of his treatment records, then the ALJ is entitled to make a decision based on the consultative examination of Dr. Barngrover or order another consultative psychological or psychiatric examination of plaintiff. See Bishop v. Sullivan, 900 F.2d at 1262; 20 C.F.R. § 404.1517(a).

### VII.   CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled, solely because all of the relevant treatment records are illegible. Therefore, it is

ORDERED that the decision of the Commissioner is reversed. It is further

ORDERED that this case is remanded for further consideration.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 2, 2016